New Illinois Athletic Club v. Genslinger, 211 Ill. App. 220.

In an action by a second chattel mortgagee on the replevin bond of the first mortgagee, given to obtain possession of the property, which was in possession of the second mortgagee after default, it was not incumbent upon plaintiff, in the first instance, to show that in the execution of the. mortgage the corporation mortgagor had complied with all the requirements of the law, even though the execution of the instrument had not been directly authorized by members of the corporation.

---

## New Illinois Athletic Club of Chicago, Appellee, v. Charles Henry Genslinger, Appellant.

### Gen. No. 23,618.

1. CORPORATIONS, § 27*—*when cancellation of contract for compensation of promoter not shown.* Evidence *held* insufficient to show the cancellation by mutual agreement of a contract between an athletic club and a promoter for the formation of the corporation and for compensation for services by payment of a percentage of 6 per cent. on each membership up to 8,000 members, except on 1,000 members, the memberships for which number should be issued to him when 5,000 members were procured, and providing that the contract should be completed when the latter number of members was secured.

2. CORPORATIONS, § 27*—*what is not evidence of waiver of rights*

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

*of promoter under contract.* The fact that a promoter of an athletic club, who has agreed to secure a certain membership for the club in consideration of a certain commission and a bonus of a certain number of memberships when the number of memberships received reaches a certain figure, resigns as secretary is no evidence of his intention to waive his rights under the contract.

3.  CORPORATIONS, § 27*—*when contract with promoter as to compensation is not unreasonable.* A contract between the promoter of an athletic club and the club for the sale of memberships on a commission basis, resulting in charges of over $46,000 and entitling him to a bonus of 1,000 memberships, after procurement of 5,000 members, was not unreasonable where over 6,000 members were secured, and his services were rendered in good faith and were efficient, resulting to the profit of the club of several hundred thousand dollars because of the procurement of a valuable lease.

4.  CORPORATIONS, § 262*—*when contract not void.* Evidence *held* to show that the majority of the board of directors of a corporation were not personally interested in a contract with a promoter so as not to render it void.

5.  CORPORATIONS, § 27*—*when contract with promoter enforceable.* A contract made with a promoter of a corporation before its organization is not enforceable against the corporation unless such contract is ratified by the corporation after its organization.

Appeal from the Circuit Court of Cook county; the Hon. JESSE A. BALDWIN, Judge, presiding. Heard in this court at the October term, 1917. Reversed and remanded with directions. Opinion filed May 13, 1918. Rehearing denied May 27, 1918. *Certiorari* denied by Supreme Court (making opinion final).

THURMAN, HUME & KENNEDY, for appellant; HOLT, CUTTING & SIDLEY, of counsel.

HARRY P. SIMONTON, CHILDS & CHILDS and RICHARDS, VOIGT & DARBY, for appellee.

MR. JUSTICE DEVER delivered the opinion of the court.

The complainant, New Illinois Athletic Club of Chicago, filed a bill of complaint in the Circuit Court of Cook county against the defendant, Charles Henry Genslinger, to restrain him from prosecuting a suit brought by him in the Municipal Court of Chicago

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

222     Appellate Courts of Illinois.

New Illinois Athletic Club v. Genslinger, 211 Ill. App. 220.

against complainant, in which suit the defendant claimed that complainant was indebted to him in the sum of $200,000. The defendant filed an answer to the bill of complaint in which he assented to an accounting as prayed for in the bill, and he also filed a cross-bill in which he prayed for an accounting against the complainant and for a money decree in his favor and also for the delivery to him of 1,000 memberships in the complainant corporation.

From the evidence heard on the trial it appears that the defendant for some years prior to the year 1904 had been engaged in promoting the organization of certain clubs and associations and that he had become, by reason of his training, an expert in this kind of work. For some months prior to December, 1904, the defendant had been engaged, with certain other persons, in an effort to organize an athletic club in the City of Chicago. Much labor and service were rendered by the defendant prior to the above date in effort to procure members for the proposed organization and in procuring a site and preparing for the building of a clubhouse which was to become the home of the new club. In pursuance of an oral understanding between defendant, William Hale Thompson and other persons interested in organizing the club, the club was organized, and on December 3, 1904, at the first meeting held by its board of directors, the resolution following was adopted:

"Whereas, the details of organization, and work in obtaining members, and in otherwise carrying out the formation of the New Illinois Athletic Club of Chicago have been done largely by Charles H. Genslinger; and

"Whereas, prior to the rendering of such services by said Genslinger, certain agreements were entered into between the said Genslinger and the parties organizing and forming the said New Illinois Athletic Club of Chicago for compensation for the services of said Genslinger, in connection with such organization and formation; and

"Whereas, the said Genslinger is performing all such services as were expected of him, and will have fully performed and carried out his contract when five thousand members shall have been secured;

"Be it resolved:  That the New Illinois Athletic Club of Chicago recognize and approve, and it does recognize and approve and ratify the agreements hereinbefore entered into on its behalf by those who originated and organized it with said Genslinger.

"Be it further resolved, that one thousand fully paid up and transferable certificates of membership be issued to the said Genslinger, and the proper officers of the club are hereby authorized to execute and issue such certificates when the membership of said club reaches five thousand.

"Be it further resolved, that said certificates issued to said Genslinger shall be transferable only to elected members of the club, and shall upon the first transfer from Genslinger be exempt from payment of transfer fee.

"Be it further resolved, that a commission of six per cent on each and every membership issued by said New Illinois Athletic Club other than the said one thousand certificates hereinbefore mentioned shall be paid to said Genslinger, up to eight thousand members."

The complainant charged in the original bill that the paragraph in the above resolution referring to the issuance to defendant, under certain circumstances, of 1,000 certificates of membership, was not included in the resolution actually adopted by complainant, and, further, that the resolution only expressed a part of its contract with defendant; that in return for the compensation to be paid the defendant under the resolution he was required "to organize a new Illinois Athletic Club with a large frontage on Michigan avenue with a large clubhouse suitable for the accommodation of 10,000, completely furnished and equipped without bonded or other indebtedness."  The defendant denied that he at any time made any such agreement as is insisted upon by complainant, and he asserts that the res-

olution above set forth constitutes his contract with complainant..

The evidence shows that defendant ''and his associates'' proceeded to build a clubhouse upon Michigan avenue upon ground, a lease for which was obtained by defendant from one Caryl Young.' William Hale Thompson, the then president of the club, testified that on July 28, 1905, he said to defendant that defendant's contract for services was based upon a much larger club plan; that defendant had been unable to carry out his contract with complainant; that the part of the contract which provided for the delivery of 1,000 memberships to defendant should be canceled; that defendant finally agreed to this suggestion and that later the defendant delivered the said resolution adopted by the club to the witness with the following indorsement thereon in red ink:

''Cancelled by mutual consent,
C. H. Genslinger,
July 28, 1905.''

It does not appear from the evidence that any objection was made by anybody concerned as to the manner in which Genslinger had performed his contract, even though large financial obligations had been incurred under the lease and building contracts, apparently with the full knowledge of Thompson and Genslinger's other associates, until the date of the alleged conversation between Thompson and defendant. Genslinger denied that he had agreed orally or otherwise to cancel his agreement with complainant and he testified that his signature to the cancellation agreement was a forgery.

Up to the time of his resignation in 1906 as secretary of the club, the defendant had received $21,600 as commissions upon moneys received by the club in the sale of membership certificates. A further sum of $1,000 was later paid to him by complainant, and it is insisted that this latter sum was in full settlement of all defendant's claims against the club. Defendant insists that this payment was merely on account.

The cause was referred to a master, and in confirmation of his report to the court a decree was entered granting a part of the relief prayed by the bill of complaint and dismissing the cross-bill for want of equity. The decree finds that at no time did the membership of the club reach 5,000 or exceed 3,600 members; that at the time Genslinger resigned as secretary he had not accomplished the things he had agreed to do under his contract, and that defendant and complainant were precluded by the settlement referred to from recovering further sums from each other. The defendant and cross-complainant brings the case here by appeal for review.

It is a strange circumstance that the original bill of complaint sets out and relies upon a resolution adopted by the board of directors of the club, which is as follows:

"Whereas the details of organization and work obtaining members and otherwise carrying out the formation of the New Illinois Athletic Club have been done largely by Charles Henry Genslinger,

"Be it resolved on motion duly made and seconded and carried that the New Illinois Athletic Club of Chicago pay said Genslinger as a commission for his work in organizing and obtaining members and carrying out the formation of this club a commission of six per cent on each and every membership issued by said New Illinois Athletic Club up to 8,000 members."

On the trial of the cause, however, Thompson, complainant's president, while on the witness stand, produced the resolution as contended for by the defendant and no proof was offered of the adoption of a resolution as alleged in the bill. Later in his testimony Thompson produced a copy of the original resolution as it appeared in the minute book with the cancellation agreement as above indicated indorsed thereon. It is suggested, although not proven, that the resolution set out in the bill was originally adopted by the board of directors and inserted in the minute book and that it was extracted therefrom by the defendant. But, aside

226    APPELLATE COURTS OF ILLINOIS.

New Illinois Athletic Club v. Genslinger, 211 Ill. App. 220.

from the fact that defendant's possession of the minute book for a time gave him an opportunity to commit this wrong, there is no evidence that he in fact did, as suggested in the brief, tear this document from the minute book, and there is ample evidence that the minute book was accessible to a number of persons.

The bill herein was filed in the year 1913, about 7 years after defendant resigned his office as secretary of the club, during which time the minute book in question was in the possession of his successor in office and was open to the inspection of the officers and members of the club. Notwithstanding the charge in the bill, we find it, in effect, conceded on the trial that the resolution originally adopted by the club was as insisted upon by the defendant, and not as contended for by complainant in its original bill. There is inherent evidence of the truth of Genslinger's testimony that the original resolution was as claimed by him. So far as the evidence in the record shows, no suggestion had been made by anybody in interest at any time that there had been a cancellation of the contract between defendant and complainant at any time until the production of the cancellation agreement by Thompson when on the witness stand. As the case then stood upon the pleadings, the complainant was required to prove its case as alleged in the bill. This it evidently was unable to do, for in presenting its case it introduced in evidence the resolution as insisted upon by defendant. Thereafter Thompson produced the alleged cancellation agreement and it became necessary to file an amended bill of complaint which set up for the first time, and several years after defendant's resignation as secretary, the alleged cancellation of his contract with complainant. No suggestion was made in the original bill either of a settlement of the matter in controversy between the parties, or that there had been a cancellation or a modification of the contract of December 3, 1904.

There is a direct contradiction in the evidence as to

whether defendant ever signed the cancellation agreement. He insisted that he did not; his testimony is supported by that of other witnesses and it finds strong corroboration in the circumstances of the case. It does not appear that any person saw defendant sign the cancellation agreement. Thompson says that the resolution was handed to him by the defendant with the cancellation agreement indorsed thereon. The agreement purports to be by mutual consent. It is signed by Genslinger only, and notwithstanding the fact that it relieved and, according to Thompson, was intended to relieve the complainant of large responsibility, no record was made of it by Thompson, or by any other officer of the club, and, as stated, its very existence seems to have been unknown until the master had taken much evidence in the case. Under such circumstances we find it difficult to believe that defendant is committing perjury when he says he did not sign the cancellation agreement in question. As against the circumstances and the evidence which tends to show the signature was not that of defendant, certain witnesses, two of whom were professional handwriting experts, testified that in their opinion the signature in question was the genuine signature of defendant; the direct and positive oath of the defendant, strongly supported as it is by undenied circumstances and by the testimony of one Stevens, paymaster of the club, who stated that defendant did not sign the cancellation agreement and that the resolution was in his, the witness', possession as late as 1910, leads us to the conclusion that the defendant did not sign this agreement. This conclusion is also strongly supported by the subsequent conduct of the parties to the controversy.

It is admitted that during the years that elapsed between the filing of the bill and the resignation of defendant as secretary of the club he had made efforts to adjust his claim against the complainant. Leo J. Doyle, an attorney for defendant, in 1910 endeavored to adjust the claim with the complainant through its

228        APPELLATE COURTS OF ILLINOIS.

New Illinois Athletic Club v. Genslinger, 211 Ill. App. 220.

then officers. No denial was then made of the contract between the parties nor was it asserted that it had been canceled. Such discussion as was had related to a basis for determining the membership of the club and the amount due the defendant. The fact that the defendant resigned as secretary of the club did not, we think, furnish any evidence of his intention to waive his rights under his contract, and there is uncontradicted evidence in the record that, at the time the resignation was tendered and accepted, the defendant and officers of the complainant expressly agreed that his resignation was not to affect his rights under the contract.

Thompson and one Lytton testified that in August 1906 complainant and defendant settled the matter of defendant's compensation for his services on the basis of $21,600 which the defendant had at that time received, and the further sum of $1,000 to be thereafter paid to him; it appears that the sum of $1,800 was paid by complainant to defendant, in addition to the $1,000 referred to, in August, September and October following the date of the alleged settlement. Further than this, the original bill filed by the complainant makes no claim of a settlement with Genslinger in 1906. Indeed, the complainant prays in its bill for an accounting against the defendant on the theory, as we understand the pleadings, that the defendant had been paid more than he was entitled to under his contract. Even under the amended bill filed by complainant, it is not asserted that there had been a settlement of the controversy between it and defendant. Complainant's case as made under its amended bill of complaint is that there was a cancellation of defendant's contract in 1905. *Millard v. Millard,* 221 Ill. 86.

Genslinger testified that in the spring of 1907 he had interviews with Thompson and Lytton with reference to his claim and that he at these interviews offered to take the sum of $30,000 in full settlement thereof, payment to be made in the bonds of complainant, and that Thompson stated he would give the notes of the club

for this sum, but that he would not pay the amount in the bonds of the club. This testimony is corroborated by that of Charles B. Stafford, defendant's attorney. Thompson testified that he did not remember this interview; that he never urged Genslinger to accept $30,000 in notes of the club. He did admit, however, that Genslinger in September, 1907, asked him for a settlement of his claim against the club and that in answer thereto he, the witness, said that the club was in bad financial condition; that he said to Genslinger that the club had a great many creditors and that a suit against it, especially by him, Genslinger, might destroy it; that he, Thompson, asked Genslinger not to bring suit as it might hurt the club. Lytton testified that he did not remember any conversation with defendant at which Stafford was present. He did not, however, deny the truth of Stafford's testimony. Nor did either Lytton or Thompson assert at this time that Genslinger had either canceled his contract with the club nor that there had been any settlement of his claims against the complainant.

The cancellation agreement is alleged to have been made by Genslinger, July 25, 1905. Thompson testified that the club started out well and that everything went along satisfactorily for about a year and until the spring of 1906; that early in the summer of 1906 "we began to have trouble with our finances, and the applications for membership fell off." The club was not in the year 1905 in financial difficulties and no reason then existed, so far as the evidence discloses, why Genslinger should cancel, or why he should be requested to cancel, his contract with the club, except that it is asserted Genslinger had been unable to organize and provide accommodations for the larger club which Thompson asserts was contemplated by the parties at the time the contract was entered into. Whatever may be said as to the change made, if in fact any such change was made, in the original plans of the parties, the express contract fixed the compensation to be paid

230 APPELLATE COURTS OF ILLINOIS.

New Illinois Athletic Club v. Genslinger, 211 Ill. App. 220.

the defendant for his services, and it is not asserted, nor is it shown anywhere in the evidence that the defendant agreed to a change in the compensation to be paid him for his services except as claimed that he delivered the cancellation agreement referred to to Thompson.

From the whole record there can be but small doubt of the large value of defendant's services to complainant. That he devoted much time and labor to the organization of the club is certain. It is conceded that he procured a lease for the club, which its president, Thompson, stated, represented a profit to complainant of $25,000 a year, and which this witness also stated would in 10 years from 1908 represent a value to the club of at least $1,000,000. Other evidence was introduced from which it appears that the single act of defendant in procuring this lease and turning it over without any additional compensation from the club was a service which brought a profit to the club of several hundred thousand dollars.

The contract required the payment to defendant of 6 per cent of all moneys received by the complainant from the sale of memberships in the club. The evidence shows that up to April 30, 1915, the club received for memberships a total sum of $771,392.05, 6 per cent commission on this sum would amount to $46,283.52, leaving a balance due Genslinger, under his contract as of April 30, 1915, of $23,683.52. Up to April 30, 1915, 6,305 certificates of membership of the resident and nonresident class and 412 certificates of the life membership class had been issued. More than 5,000 members having been admitted to the club, the defendant is entitled to the compensation provided for in the contract.

It is insisted for complainant that the contract in question was unreasonable. Genslinger brought his suit in the Municipal Court upon an express contract. The prosecution of this suit was enjoined and the parties submitted, without objection, the matters in con-

CHICAGO—FIRST DISTRICT—MAY, 1918.     231

New Illinois Athletic Club v. Genslinger, 211 Ill. App. 220.

troversy between them to the jurisdiction of the Circuit Court. No evidence was introduced which directly questioned the reasonableness of the compensation to be paid defendant under the contract. The services rendered by defendant were fully known to Thompson and the other directors of the club. The contract was made by the parties and in part executed by them without question as to its reasonableness. As stated, procuring the lease of the ground upon which the clubhouse was subsequently built and assigning it to the complainant was in and of itself a service of great value to the complainant. Defendant's other services in procuring a large membership for it was also a matter of much consequence and benefit to complainant. It is evident that during the time of his connection with the club and its board of directors, the defendant was dealing with men of business experience. His services appear to have been efficient and to have been rendered in good faith, and when consideration is given to the value of these services to the club, the provisions of the contract do not appear to have been unreasonable.

It is contended by complainant that the contract in question was voidable on the theory that the directors of a corporation sustain a fiduciary relation to it and its stockholders and are disqualified from voting on a contract in which they are personally interested, unless the contract has received the vote of the majority of disinterested directors. This point is stated in different ways by counsel in their brief, and it seems to be principally relied upon by complainant to defeat the claim of defendant. The theory is that a majority of disinterested members of the board of directors did not vote for the resolution which was adopted on December 3, 1904. Counsel have cited many cases in support of their contention, but these cases are not applicable here for the simple reason that the evidence discloses that a majority of the board of directors were not interested in the contract. Defendant was a member of the board of directors, as was his attorney

Stafford, who had a 20 per cent interest in the commission to be paid defendant under the contract, and also one Merigold, who was said to be a friend of Genslinger. There is no evidence in the record that Merigold had any interest whatever in the contract. The evidence discloses that four, a majority, of the directors were disinterested persons, and even if it be conceded that the interest of Stafford was such as might disqualify him, it is clear that complainant has failed to show that the contract was not made by a majority of the board of directors who were not in any way individually interested in its performance.

It is insisted on behalf of the complainant that a contract made by the promoter of a corporation before it is organized is not binding on the corporation, even though it receives benefits therefrom, unless the corporation itself by a subsequent agreement for a valuable consideration agrees to be bound by the contract.

We have examined the authorities cited by counsel, among which are the cases *Gent v. Manufacturers' & Merchants' Mut. Ins. Co.*, 107 Ill. 652, and *Park v. Modern Woodmen of America*, 181 Ill. 214, and do not find that they support in its entirety this contention of complainant. It is true, as asserted, that a contract made with a promoter of a corporation before its organization is not enforceable against the corporation unless such contract is ratified by the corporation after its organization. Cook on Stockholders, sec. 707. Here, however, it is conceded that the contract with defendant was expressly ratified by the corporation. Indeed, the terms of the contract and the compensation to be paid the defendant thereunder can only be determined from an examination of the resolution adopted by the corporation. It received large benefits under the contract, and the defendant performed continuing services of value to it after the corporation was organized.

On the whole record we are of opinion that Genslinger is entitled to recover under his contract; that the evidence heard upon the trial strongly supports his

contention that he did not sign the cancellation agreement; that no settlement was had of matters in controversy between the parties, and that the defendant is entitled to recover the sum due him under his contract, which the evidence shows to be $23,683.52. Defendant under his cross-bill is not entitled to recover the value of the 1,000 memberships in the club which he claims should have been delivered to him under the terms of his contract. It would be difficult at this time to fix the value of these memberships. We think that under his contract these memberships should be delivered to him and that their value, if they have value, is not for us to determine.

The decree of the Circuit Court of Cook county will be reversed and the cause remanded with directions to that court to dismiss the bill of complainant for want of equity; to enter a decree in favor of the cross complainant for the sum of $23,683.52, and to decree that the complainant be directed to issue to cross complainant the 1,000 memberships in its club herein referred to.

*Decree is reversed and the cause remanded with directions.*